## THE NEW ROCHELLE.

### KAHNWEILER et al. v. PFITSCH.

(District Court, S. D. New York. June 4, 1923.)

1. **Shipping ⬅76.—Ship held not bound to await repair of equipment not conforming to contract.**

   Where collapsible boats tendered by the contractor for equipment of a steamship did not conform to the contract, the ship was not bound to accept them, nor to await their repair, where to do so would delay the vessel, with consequent damage.

2. **Shipping ⬅76—Acceptance of equipment from contractor held conditional; "conform to and pass."**

   Acceptance from the contractor of boats for the equipment of a steamship, provided they should "conform to and pass all the requirements of the United States steamboat inspection laws," required, not only that they should conform to such laws, but that they should in fact be accepted by the inspectors.

3. **Shipping ⬅9—"Joints" of air tanks.**

   The meeting of the edge of a nipple on an air tank and the metal of the tank held a "joint," within the meaning of the general inspection rules, requiring "all joints of air tanks to be double riveted and tightly caulked."

4. **Shipping ⬅76—Contract to supply equipment for ship held indivisible.**

   A contract to supply equipment for a steamship, consisting of collapsible and metal boats and life rafts, held indivisible, and the ship held not bound to accept the life rafts, though they conformed to the contract when the boats tendered did not.

5. **Shipping ⬅76—Liability under contract stated.**

   Where some of the items of equipment supplied by a contractor to a ship complied with the contract, and others did not, and none were accepted, the damages recoverable by the ship for breach of the contract are limited to the necessary extra cost above the contract price of supplying such items as did not conform to the contract.

6. **Admiralty ⬅36—Counterclaim can be considered only in reduction of damages.**

   To authorize an affirmative recovery by a respondent, he must file a cross-libel, and a counterclaim can only be allowed in reduction of the damages otherwise recoverable by libelant.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit by Louis Kahnweiler & Mina Kahnweiler, doing business as David Kahnweiler's Sons, against Charles G. A. Pfitsch and the steamer New Rochelle. Decree for respondent.

Max Rackmore, of New York City, for libelants.
Charles J. Lane, of New York City, for respondents.

LEARNED HAND, District Judge. [1] It is clear that the collapsible boats were never tendered in such condition as to require acceptance. Assuming that "new" meant no more than "unused," they were not "in first-class condition," because the canvas was torn, the kopak fenders ripped, the decks broken, and some of the gunwales staved in. Moreover, there is unquestioned evidence as to at least three of them that the inspector would not pass them, and indeed it would have been most improper for him to do so. It is argued that the libelant could have made all necessary repairs, and was willing to make them. Yet up to July 31, when Pfitsch ordered the Balsa equipment, he was still in default. How long was the respondent to wait? Kahnweiler was already 10 days late, and the New Rochelle would be held up at her pier, if she had not already been. I cannot see how on any theory the respondent can be held for this part of the equipment.

[2] I think that any dents or defects in the metallic boats were waived by Greiner's acceptance of them. He had full opportunity to inspect them, and chose to ignore these defects. The respondent might recover damages for the libelants' failure to conform to the specifications, but he could not have rejected. However, this acceptance was provisional upon their conforming to and passing "all the requirements of the United States steamboat inspection laws." This could only mean that the equipment should be such as would in fact pass muster. The phrase "conform to and pass" is significant. "Conform to" means that they should in fact answer the requirements, but "pass" means something more—that in fact they should be accepted, so that the respondent could use them. He was absolutely dependent upon their acceptance; it was nothing to him whether the inspectors were right or wrong.

[3] As to the nipples on the tanks, I believe, first, that they did not "conform to" the requirements of the General Rules of the Board of Supervising Inspectors. Section 28 of rule III reads in part: "All joints of air tanks shall be double riveted and tightly caulked." The question is whether the meeting of the edge of the tank metal and that of the nipple is a "joint." A difference in interpretation appears to exist between districts in this respect, but as mere matter of construction it seems to me that the local interpretation is correct. The purpose is, of course, to insure a hermetic sealing of the tank, and, while it is true that a long joint is more likely to shake apart, on the other hand, the nipple is subject to sudden jars, since it extends above the surface of the tank. Besides, in testing, it may be laterally strained so as to open. I see no reason, therefore, to exclude the edge of the nipple from the general word "joint."

But, even if this were not true, the inspector must inspect these boats, and he refused to pass them. If any appeal lay to the supervising inspector, I cannot see why that was the respondent's duty. The libelants had engaged to tender an equipment which should pass; if they failed at first, they must cure their default, either by physically changing it, or by securing a new ruling. Indeed, they appear to have so understood their obligations themselves. Therefore I hold that they failed in respect, also, of the metallic boats.

[4] I believe that the life rafts were actually brought to the Morgan Street pier, and that Baker went on board the New Rochelle and saw some officer to whom he said that he had them ready to deliver. On the whole I therefore believe that a tender was made of these, and the evidence is that they were as specified. However, I do not regard this contract as divisible. It is not even argued that a part of any single item could be properly tendered without the whole; but the libelants insist that they might tender the life rafts and default on the boats, both collapsible and metallic. This contention seems to me inadmissible. Suppose the respondent had been unable to obtain the boats necessary for 75 per cent. of the passengers. Can it be supposed that he would have been obliged to accept the rafts alone? I submit that such a construction would be wholly contrary to the intent of the parties. They were dealing in a complete equipment of the vessel, one which was fixed by law and sufficient to accommodate 1,760 passengers, of whom 600 were to be on rafts. To fail in two-thirds and to perform as to one-third was totally to fail, so far as the respondent was concerned. He could do nothing with the rafts alone, unless he could get the boats.

Now, it is true that he could and did get enough boats to complete his complement; but that was a chance which cannot control the original intention of the parties. That must be ascertained by the situation when the contract was made, and then it was clear that the libelants undertook to equip the vessel in its entirety. Under familiar rules, small deficiencies in performance would not justify entire repudiation; but the failure as to two-thirds cannot be regarded as a compliance with the conditions precedent. Therefore I hold that the tender of the rafts need not have been accepted, the rest of the performance never having been made. There is evidence which I accept that some of the equipment was actually received, and that not all of it was returned. For that retained the respondent is responsible, as well as for the life jackets, but that is all.

[5] As to the respondent's counterclaims, I find that the libelants are liable for the added cost required in buying the necessary outfit from the Balsa Company. The damages are, however, not to be reckoned merely by subtracting what the respondent paid from the cost under the contract in suit. So far as appears, he might have used the rafts, these being presumptively lawful, and he was bound, under his duty to keep down his damages, to accept these pro tanto. His loss is the necessary cost of accommodating in boats those passengers whom he would have seated in the 12 collapsible and 8 metallic boats which the libelants failed to deliver. If none were available except the Balsa

boats, he was forced to buy these, and his damages are the excess in their cost over what he ordered from the libelants, less any added value they would have above the specified equipment in good condition.

[6] It is settled law in this district (Mayer & Lage v. Prince Line, Limited, 264 Fed. 854) that a respondent cannot recover on a counterclaim, but must file a cross-libel. Therefore the respondent's counterclaims here will serve only to reduce his damages; he can get no affirmative decree. Thus it is unnecessary to decide whether he is entitled to consequential damages for the detention of the New Rochelle. The counterclaim for damages on the Balsa contract will undoubtedly much more than use up any recovery for the equipment retained. Probably the parties will not wish the expense of a reference, which will be necessary only in case the respondent intends to press his claims by a cross-libel or in some other form. If he does, it will be necessary to liquidate the value of the equipments retained by the respondent, and his damages in the purchase of so many Balsa boats as would accommodate the passengers which the 20 boats specified in the contract would have carried.

The decree may reserve any consequential damages not here decided. If the parties decide on a reference, Mr. William Parkin will be the commissioner. Costs to the respondent.